REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND


Nos. 486 and 2806

September Term, 2013

OLIVER ALLEN RUSSELL

v.

STATE OF MARYLAND


Krauser, C.J.,
Wright,
Berger,

JJ.


Opinion by Berger, J.


Filed: February 25, 2015

This case involves an appeal of two orders of the Circuit Court for Baltimore County modifying the conditions of appellant Oliver Allen Russell's probation. On October 10, 2007, Russell was convicted of child abuse, sexual abuse of a minor, second degree rape, and two counts of third degree sex offense in case number K-06-005368. The court sentenced Russell to eighteen years' imprisonment with all but eight years suspended, and five years' probation. Russell appealed to this Court and, in an unreported opinion, we reversed Russell's convictions and remanded the matter to the circuit court. *Russell v. State*, No. 2649, Sept. Term 2007 (filed July 23, 2009).

Russell was retried on April 27-30, 2010 before the Honorable Michael Finifter. On April 30, 2010, Russell was convicted of child abuse and sex abuse of a minor. The court sentenced Russell to ten years' imprisonment, suspending all but time served. The court further sentenced Russell to a five year period of probation.[1]

On April 13, 2012, before the Honorable Sherrie R. Bailey, Russell entered an *Alford* plea to one count of third-degree sex offense in case number K-11-003816 ("the Judge Bailey case"). On April 24, 2012, the court sentenced Russell to ten years' imprisonment, suspending all but time served, and a three-year period of probation.[2]

On February 21, 2013, Russell's probation agent filed a request to modify the conditions of Russell's probation in case number K-06-005368 ("the Judge Finifter case"),

---

[1] Barring any extensions, Russell's probation in the Judge Finifter case is scheduled to expire on or about May 11, 2015.

[2] Barring any extensions, Russell's probation in the Judge Bailey case is scheduled to expire on or about April 24, 2015.

requesting that the court add COMET[3] supervision to Russell's probation. On February 26, 2013, Russell's probation agent filed a request to modify the conditions of Russell's probation in the Judge Bailey case, requesting that the court add COMET supervision to Russell's probation. Because the two requests to modify involved the same requested condition, the court scheduled a joint hearing before Judge Bailey and Judge Finifter on April 12, 2013. After the hearing, the trial court granted the probation officers' requests to modify both probations, adding the condition of COMET supervision to Russell's probations. This timely appeal followed.[4]

On appeal, Russell presents a single question for our review:

> Did the circuit court err in imposing as an additional condition of probation Collaborative Offender Management Enforcement Treatment (COMET) supervision, a program that permits the supervision team, *inter alia*, to require a probationer to submit to polygraphs, to impose a curfew and increased reporting requirements if the probationer declines to answer a question during a polygraph, to otherwise impose a curfew between 7 p.m. and 7 a.m., and to electronically monitor the probationer with a Global Positioning System (GPS) device?

The State has moved to dismiss Russell's appeal, asserting that the circuit court's order modifying Russell's probation is not an appealable final judgment.

---

[3] "COMET" is an acronym for Collaborative Offender Management Enforcement Treatment.

[4] In the Judge Bailey case, Russell filed an application for leave to appeal rather than a notice of appeal. Presumably, Russell believed he needed to file an application for leave to appeal because his conviction resulted from an *Alford* plea. *See* Md. Code (2006, 2013 Repl. Vol.), § 12-302(e)(2) of the Courts and Judicial Proceedings Article. In the Judge Finifter case, Russell filed a notice of appeal, rather than an application for leave to appeal.

2

For the reasons stated herein, we shall deny the State's motion to dismiss and affirm the judgments of the Circuit Court for Baltimore County.

## FACTS AND PROCEEDINGS

The COMET supervision program was created in response to legislation passed by the General Assembly in 2006 which mandated the establishment of sexual offender management teams for the supervision of sexual offenders. Md. Code (2001, 2008 Repl. Vol., 2010 Suppl.), § 11-725 of the Criminal Procedure Article ("CP"). At the April 12, 2013 hearing, Division of Parole and Probation ("DPP") Agent Steven DeGross, Jr. testified regarding what COMET supervision entails and further explained why the DPP sought to impose COMET supervision upon Russell.

A COMET supervision team is made up of members from various agencies and offices including the DPP, the local police department, the local State's Attorney's office, and treatment providers. A probationer on COMET supervision is required to comply with a sexual offender management program, which may include intensive reporting requirements, specialized sex offender treatment, electronic GPS monitoring, polygraph testing, computer monitoring, and being compelled to take medication.[5] COMET supervision also may include a 7:00 p.m. to 7:00 a.m. curfew. Agent DeGross testified that the curfew can be adjusted by the COMET supervision team "for work purposes, for church services, for doctor's

_____

[5] At oral argument, Russell's attorney explained that, to his knowledge, no GPS, polygraph, or curfew conditions have actually been imposed upon Russell at any time.

3

appointments and things of that nature." The decision to impose a curfew is left to the discretion of the COMET supervision team. The court is not involved in the determination of whether a curfew is appropriate. A curfew may also be imposed as a sanction if a probationer declines to answer a question during a polygraph examination.

Probationers under COMET supervision may be required to submit to polygraph tests during which a state police polygrapher asks the probationer about the crime for which he is on probation. The probationer is also asked about his activities while on probation. Agent DeGross testified that a probationer may be asked whether he has had contact with the victims or unlawful contact with any children. If a probationer admits to a crime, the polygrapher discontinues the polygraph test, notifies the probation agent, and has the probationer repeat the admission to a probation agent. If a probationer does not answer a question during a polygraph test about possible criminal activity, the DPP imposes consequences upon the probationer. Potential consequences include an increased supervision level and/or the imposition of a curfew.[6] Agent DeGross testified that the DPP does "not request a violation of probation hearing, or request a . . . summons or warrant" when a probationer refuses to answer questions during a polygraph examination.

---

[6] Agent DeGross explained that, with respect to an increased supervision level, "[i]f [the probationer is] reporting once a month we have him report weekly" and, with respect to the imposition of a curfew, "[i]f [a probationer] has . . . free range of, of the city, or the State of Maryland we put him on curfew."

The COMET team also has discretion to impose GPS electronic monitoring, which allows the team to monitor where the probationer goes "24 hours a day, seven days a week." Agent DeGross explained that GPS supervision is imposed as a "temporary 90 day process" but that the COMET team, in its discretion, could put a probationer back on GPS monitoring for an additional 90-day period.

The circuit court granted the request of the State and DPP to modify the terms of Russell's probation to include COMET supervision in the Judge Finifter case (in an order dated April 25, 2013 and filed May 2, 2013) and in the Judge Bailey case (in an order dated May 23, 2013 and filed May 29, 2013). This appeal followed.

## MOTION TO DISMISS

The State asserts that the orders modifying Russell's probations are not appealable final judgments under Md. Code (1974, 2013 Repl. Vol.), § 12-301 of the Courts and Judicial Proceedings Article ("CJP").[7] The State asserts that the court's orders modifying Russell's

---

[7] CJP § 12-301 provides:

> Except as provided in § 12-302 of this subtitle, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

probations are not appealable, either by direct appeal or application for leave to appeal. We are unpersuaded.

First, with respect to Russell's application for leave to appeal in the Judge Bailey case, we note that this Court set the case in for briefing and argument but does not appear to have actually ruled on Russell's application for leave to appeal. To the extent that the application for leave to appeal has not yet been ruled on, we hereby grant Russell's application for leave to appeal the order modifying his probation in the Judge Bailey case.

We now turn to the State's argument that an order modifying probation does not constitute an appealable final judgment. A "final judgment" is defined as "a judgment, decree, sentence, order, determination, decision, or other action by a court, including an orphans' court, from which an appeal, application for leave to appeal, or petition for certiorari may be taken." CJP § 12-101. The Court of Appeals has explained:

> "[A] final judgment" is one that "either determine[s] and conclude[s] the rights of the parties involved or den[ies] a party the means to 'prosecut[e] or defend[ ] his or her rights and interests in the subject matter of the proceeding.'" *In re Billy W.*, 386 Md. 675, 688, 874 A.2d 423, 431 (2005) (quoting *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767, 773 (1989)) (some alterations in original). Important is whether "any further order is to be issued or whether any further action is to be taken in the case." *Id.* at 689, 874 A.2d at 431.

*Douglas v. State*, 423 Md. 156, 171 (2011).

Russell's probation order was modified by the circuit court pursuant to Maryland Rule 4-346(b), which provides that "[d]uring the period of probation, on motion of the

defendant or of any person charged with supervising the defendant while on probation or on its own initiative, the court, after giving the defendant an opportunity to be heard, may modify, clarify, or terminate any condition of probation, change its duration, or impose additional conditions." To date, no reported appellate decision has explicitly addressed whether an order modifying probation pursuant to this rule constitutes an appealable final judgment. Our analysis, however, leads us to conclude that the circuit court's order modifying Russell's probation satisfies all of the requirements for a final judgment.

The circuit court's order was clearly intended by the circuit court judge to be a final resolution of the State's motion to modify the conditions of Russell's probation. There is no indication that the terms of Russell's probation would be reconsidered at any future time. We do not believe that there was "any further order . . . to be issued" or "any further action . . . to be taken" with respect to Russell's probation. *See Douglas*, *supra*, 423 Md. at 171. Furthermore, we note that we considered the merits of an appeal of a judgment modifying a probation order in *Argabright v. State*, 76 Md. App. 706 (1988). In *Argabright*, we held that the trial court did not err by adding an additional term to the conditions of the appellant's probation. *Id.* at 708.[8] We did not dismiss the appeal in *Argabright* based on final judgment

---

[8] The State cites *Argabright* for the principle that we recognized the distinction between the court's power to modify probation under Maryland Rule 4-346(b) and the court's power to modify a sentence under Maryland Rule 4-345(e). The State asserts that, because we recognized a difference between a modification of sentence and a modification of the terms of probation, an order modifying the terms of probation is not appealable. The State acknowledges, as it must, that in *Argabright* we expressly addressed the appeal of an

(continued...)

7

concerns. In the present case, we hold that a trial court's order modifying terms of a probation is an appealable final judgment. Accordingly, we deny the State's motion to dismiss.

## DISCUSSION

Russell challenges the authority of the circuit court to impose COMET supervision as a condition of his probation. Although Russell did not object to the imposition of the challenged conditions before the trial court, allegedly unlawful conditions of probation may be challenged at any time as an illegal sentence under Rule 4-345(a). *See Brown v. State*, 80 Md. App. 178, 196 (1989).

While considering the probationary terms imposed by the trial court, we keep in mind the wide latitude trial courts have in imposing conditions of probation. The authority of the circuit court to order that a defendant serve a probationary term is codified in Md. Code (2001, 2008 Repl. Vol.), §§ 6-221 and 6-222 of the Criminal Procedure Article ("CP"). We have explained:

> Sections 6-221 and 6-222 give a court entering a judgment of conviction broad powers to order probation. Section 6-221 states, simply, that, "[o]n entering a judgment of conviction, the court may suspend the imposition or execution of sentence and place the defendant on probation on the conditions that the court considers proper." Further, section 6–222 authorizes a court to

_____

[8] (...continued)
order modifying the terms of a probation order. Although *Argabright* did not expressly address the order's appealability, *Argabright* lends additional support to the conclusion that an order modifying probation is appealable.

8

"impose a sentence for a specified time and provide that a lesser time be served in confinement;[ ] suspend the remainder of the sentence; and [ ] order probation" for a period of time as elaborated upon in that statute. The latter is known as a "split sentence." *Moats v. Scott*, 358 Md. 593, 595, 751 A.2d 462 (2000). If a court imposes a "split sentence," i.e., a sentence for a specified period of time with part of the time being suspended, there must be a period of probation attached to the suspended part of the sentence. *Cathcart v. State*, 397 Md. 320, 327, 916 A.2d 1008 (2007). Without a period of probation, the sentence effectively would be for the unsuspended time only. *Id*. at 329, 916 A.2d 1008.

"Probation is by definition conditional," that is, it is imposed subject to conditions with which the defendant must comply. *Gibson v. State*, 328 Md. 687, 689, 616 A.2d 877 (1992).

*Lindsey v. State*, 218 Md. App. 512, 530 (2014).

In the present case, Russell contends that the circuit court lacked the authority to impose and/or erred by imposing three specific conditions of his probation. First, Russell asserts that the circuit court lacked the authority to delegate the power to impose a curfew to DPP and/or the COMET team. Second, Russell asserts that the circuit court erred by imposing a requirement that he submit to polygraph testing.[9] Third, Russell asserts that the circuit court lacked authority to require or permit GPS tracking as a condition of probation.

---

[9] We note that, even before the issuances of the orders modifying Russell's probation to include COMET supervision, Russell was already subject to polygraph testing. As a condition of his probation to Judge Finifter, Russell was required to "enroll [in] and successfully complete [a] sex offender treatment program." The sex offender treatment program in which Russell was enrolled included a polygraph testing component. Russell does not appear to challenge the polygraph testing component of the sex offender treatment program, upon which his probation to Judge Finifter was conditioned.

We address each of Russell's contentions in turn. No Maryland case has addressed the appropriateness of the imposition of COMET supervision generally or the imposition of a polygraph requirement specifically. Accordingly, we turn our attention to persuasive authority from federal and state courts across the country as appropriate.

## I. Curfew

Russell's first contention is that the circuit court lacked the authority to delegate to the DPP or the COMET team the authority to impose a curfew. Russell acknowledges that the court had the authority to impose a curfew, *see* CP § 6-219(a) and (b) (authorizing home detention as a condition of probation), but asserts that the court cannot delegate this authority to the DPP or the COMET team.

A probation authority is permitted to provide "specific rules designed to govern the conduct of the probationer within the ambit" of a general condition imposed by the court. *Costa v. State*, 58 Md. App. 474, 418-82 (1984). The Court of Appeals has explained:

> [F]requently, the nature of the probationary penalty is such that the circumstances of a case, like the one we now consider, render it desirable, or perhaps necessary, that the condition of probation be expressed in somewhat general terms. Such a general expression is permissible, so long as it is contemplated that the court or its designee (usually the probation authority) will provide the probationer with reasonable, specific direction within the ambit of the initially expressed general condition, and such guidance is in fact given.

*Hudgins v. State*, 292 Md. 342, 348 (1982) (footnote omitted).

10

In the present case, the court authorized the COMET team to impose a curfew between the hours of 7:00 p.m. and 7:00 a.m. with allowances made for work, church, doctor's appointments, and "things of that nature." The court deferred to DPP to determine when it was appropriate to impose the curfew. Accordingly, pursuant to the court's order, DPP would provide Russell with clear and specific rules indicating the circumstances under which the court-authorized curfew would be imposed.

Russell's reliance upon *Richards v. State*, 65 Md. App. 141 (1985), is misplaced. In *Richards*, *supra*, we held that the trial court did not have the authority to delegate the determination of the amount of restitution to the probationary authority. We held that it was a violation of the defendant's due process rights for the probationary authority to determine the amount of restitution without a hearing because the delegation "effectively denied appellant the right to be heard." *Id.* at 149. Unlike the defendant in *Richards*, *supra*, Russell had a hearing before the trial court issued an order permitting the DPP to impose a specific curfew. Accordingly, we hold that the discretionary curfew imposed by the court and administered by the DPP does not constitute an illegal condition of probation.

## II. Polygraph Testing

Russell's second contention is that the polygraph component of the COMET program is illegal. He offers four separate arguments as to why the polygraph requirement is illegal, arguing that (1) the polygraph requirement lacks a rational basis; (2) the requirement to take polygraphs is vague in that it does not make clear that a probationer is not required to

11

incriminate himself; (3) the COMET program's sanctions for declining to answer questions during polygraph examinations violate the Fifth Amendment; and (4) the legislative scheme applicable to sex offenders does not permit the polygraph component of the COMET program. We address each of Russell's arguments in turn.

## A.    Rational Basis

Russell contends that under *Brown v. State*, 80 Md. App. 187 (1989), the polygraph requirement of his probation lacks a rational basis. It is well established that "[w]hatever latitude the statutes repose in the trial judge [to determine appropriate probationary conditions], it remains, of course, fundamental that conditions of probation must be reasonable and have a rational basis." *Watson v. State*, 17 Md. App. 263, 274 (1973). Russell's reliance upon *Brown* is misplaced.

In *Brown*, *supra*, the trial court imposed a condition of probation that a probationer "pass a polygraph test in which she [provide] a full account of [her] offenses" and then repeat the statement in court. 80 Md. App. at 196-97. The purpose of the condition was for the probationer to identify the gunman.[10] On appeal, we held that the condition lacked a rational basis because the polygraph could not reliably determine whether the probationer was telling the truth with respect to the identity of the gunman. *Id.* at 199-200. We explained that although the probationer was "required to undergo polygraph examinations until such time

_____

[10] Brown was convicted of assault with intent to murder, attempted first degree murder, use of a handgun in the commission of a felony or crime of violence, and conspiracy to commit first degree murder. She was not the shooter in the incident.

12

as she passes," "[t]here [was] no assurance that the 'passing' version [would be] the truth." *Id.* at 199. We emphasized that Maryland courts have "repeatedly denounced the usefulness of polygraph examinations in eliciting accurate information." *Id.* at 199-200.

Critically, in *Brown*, *supra*, our determination that the polygraph requirement lacked a rational basis was based upon the fact that "[o]ne of the purposes of this condition [was] to have appellant identify the gunman." *Id.* at 196.[11] In the present case, there are various purposes for requiring Russell to submit to polygraph examinations beyond merely ascertaining whether Russell is being truthful during any particular polygraph examination or in response to any particular question. The Maryland Department of Public Safety and Correctional Services has explained that, as a component of COMET supervision, polygraph examinations "increase the accountability of sexual offenders for past behaviors, ensure compliance with current supervision, and serve as a deterrent." "Intensive Parole and Probation Workshop On Managing Sexual Offenders" Department of Public Safety and Correctional Services. http://www.dpscs.state.md.us/publicinfo/features/DPP_Workshop_Mng_Sex_Offenders.shtml (accessed: February 20, 2015) [http://perma.cc/SXK7-JTW3].[12]

Furthermore, state and federal courts have recognized that polygraph examinations

---

[11] The record is silent as to any other purposes of the polygraph condition.

[12] This website is archived on "Perma," a "platform that will allow authors and editors to automatically generate, store, and reference -- in a freely and publicly accessible manner -- archived data representing the relevant information of a cited online resource." Jonathan Zittrain, Kendra Albert, Lawrence Lessig, *Perma: Scoping and Addressing the Problem of Link and Reference Rot in Legal Citations*, 127 Harv. L. Rev. F. 176, 191 (2014).

further the goals of probation and/or supervised release in various ways. The United States Court of Appeals for the 10th Circuit has commented that "[p]olygraph testing could . . . encourage [a probationer] to be truthful with his probation officer, and it could alert the [probation office] to potential problems which would prompt further supervisory inquiry." *United States v. Begay*, 631 F.3d 1168, 1175 (10th Cir. 2011). Other federal courts of appeals have reached similar conclusions. *See United States v. Johnson*, 446 F.3d 272, 277 (2d Cir. 2006) ("[T]he incremental tendency of polygraph testing to promote . . . candor furthers the objectives of sentencing by allowing for more careful scrutiny of offenders on supervised release. Polygraphs have also been found to assist another sentencing objective, namely to ensure compliance with probationary terms. The lie detector may deter lying notwithstanding its arguable or occasional unreliability because of the subject's fear that it might work, or be credited by others whether it works or not." (quoting *United States v. Zinn*, 321 F.3d 1084, 1090 (11th Cir. 2003))); *United States v. Lee*, 315 F.3d 206, 213 (3d Cir. 2003) ("[T]he polygraph condition may provide an added incentive for [a probationer] to furnish truthful testimony to the probation officer. Such purpose would assist the officer in his or her supervision and monitoring of the appellant.").

State courts have similarly reasoned that, as a condition of probation, polygraph examinations support probationary goals despite their potential unreliability. Florida's intermediate appellate court held that a condition of probation requiring a probationer to submit to polygraph examinations "is valid because it provides a psychological deterrent, and

14

will assist the work of the probation officer in assuring the probationer does not re-offend." *Cassamassima v. State*, 657 So. 2nd 906, 910 (Fla. Dist. Ct. App. 1995). The Pennsylvania Superior Court commented that "the therapeutic polygraph is an essential tool for a therapist whose job it is to reveal an offender's deception and encourage him or her to confront his or her urges and deviant behavior. The test results further the primary goal of counseling as part of a sexual offender's sentence, which is to rehabilitate the offender and prevent recidivism, with reasonably small incremental deprivations of the offender's liberty." *Commonwealth v. Shrawder*, 940 A.2d 436, 443 (Pa. 2007). Other state courts have reached the same or similar conclusions. *See People v. Miller*, 208 Cal. App. 3d 1311, 1314 (Ct. App. 1989) ("The polygraph condition helps to monitor compliance and is therefore reasonably related to the defendant's criminal offense. Because this condition is aimed at deterring and discovering criminal conduct most likely to occur during unsupervised contact with young females, the condition is reasonably related to future criminality."); *State v. Age*, 590 P.2d 759, 763 (Or. Ct. App. 1979) ("[The polygraph requirement's] main function appears to be the added psychological factor that if the probationer fails to tell the truth, he will be detected. Such purpose would be in furtherance of a successful probation.").

We agree with the courts cited above that polygraph examinations serve various purposes despite their questionable reliability. Indeed, polygraphs can increase the accountability of sexual offenders for past behaviors, ensure compliance with current supervision, and serve as a deterrent is in line with the decisions reached by courts across the

15

country. Unlike the polygraph condition in *Brown*, *supra*, the purpose of which was to obtain a specific piece of accurate information, 80 Md. App. at 196, the polygraph component of Russell's probation serves multiple purposes, including promoting candor between Russell and his probation agent, reducing recidivism by serving as a deterrent, and rehabilitation.

Agent DeGross's testimony further supports the conclusion that a rationale for imposing polygraphs exists beyond merely ascertaining particular facts. Agent DeGross explained that the way in which a probationer responds to the initial polygraph enables "the treatment provider [to know] how to proceed in . . . treatment groups as well as individual therapy." Accordingly, we hold that the polygraph component of the COMET program has a rational basis.

**B.    Vagueness**

Russell's next contention is that the polygraph requirement is "impermissibly vague" because it does not make clear that the probationer is not required to incriminate himself. Russell asserts that the trial court's order, which added COMET supervision but did not specifically explain that Russell could not be compelled to incriminate himself, is not "clear, definite, and capable of being properly comprehended and understood." *See Watson*, *supra*, 17 Md. App. at 274.

Judge Finifter's memorandum opinion and order modifying Russell's probation explicitly provided that Russell's probation order was amended "to include COMET supervision." The memorandum explained that COMET supervision "is an acronym for

16

Collaborative Offender Management Enforcement Treatment." The court explained that conditions of COMET supervision include "intensive reporting requirements, electronic monitoring (GPS), verifying whether a defendant is taking his or her medication, polygraph examinations, computer monitoring, and specialized sex offender treatment."

The COMET supervision condition of Russell's probation is readily distinguishable from the probationary conditions imposed in *Watson*, *supra*, in which we expressed our concern with open-ended and indeterminate conditions. In *Watson*, *supra*, the trial court "announced as a condition of probation that appellant should pay forty percent of his earnings to or on behalf of the minor children of the victim and further provided that 'the period of probation shall be indeterminate and subject to the further order of the Court.'" 17 Md. App. at 272. We emphasized that "[h]ow the figure of forty percent was arrived at by the trial judge [was] unexplained," noting that "[w]hat relationship it [bore] to any appropriate compensation the [victim's] sons might be entitled to recover in a civil action [was] totally obscure and without any expressed factual basis." *Id.* at 274. We observed further that, because the term of probation was indeterminate, "the period of time during which the payments [were] to be made [was] limitless." *Id.* at 275. In contrast, in the present case, Russell's period of probation is for a fixed term. Further, the components of COMET supervision are specific, clear, and capable of being properly comprehended and understood by both Russell and the supervising agency.

17

Russell points us to no authority in support of his assertion that the probation order's failure to include language making it clear that the probationer is not required to incriminate himself renders the condition of COMET supervision impermissibly vague. To the extent Russell contends that the imposition of a polygraph condition violates his rights under the Fifth Amendment of the United States Constitution, his complaint is speculative and premature.

The Fifth Amendment provides, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself." In *Minnesota v. Murphy*, 465 U.S. 420 (1984), the United States Supreme Court addressed the issue of compelled self-incrimination in the context of whether a probationer can be required to answer a probation agent's incriminating questions. Although *Murphy* did not involve the imposition of a polygraph test as a condition of probation, the Court addressed a condition of probation requiring that a probationer truthfully answer a probation agent's questions. The Court emphasized that the Fifth Amendment does not prohibit a probationer from voluntarily offering incriminating information and explained that a probationer must assert the Fifth Amendment privilege and refuse to answer questions if he wishes to avoid self-incrimination. *Id.* 427-29. The Court explained that a probationer does not lose his or her Fifth Amendment right by being convicted of a crime and by being on probation and that compelled incriminating statements "are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Id.* at 426. The Court held, however, that "the general obligation to appear and

answer [a probation agent's] questions truthfully did not in itself convert [a probationer's] otherwise voluntary statements into compelled ones." *Id.* at 427.

The *Murphy* Court further addressed whether Murphy had been placed in a "penalty" situation. The Court reasoned that "if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would have created the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435. The condition requiring that Murphy be truthful with his probation agent did not indicate that his probation would be revoked if Murphy invoked the Fifth Amendment privilege. Accordingly, the United States Supreme Court held that because Murphy had not asserted the privilege, and because Murphy had not been placed in a classic penalty situation, Murphy's statements to his probation agent were not compelled. *Id.* at 440.

The United States Court of Appeals for the Eleventh Circuit addressed a claim substantially similar to Russell's in *Zinn*, *supra*, 321 F.3d 1084. Zinn was convicted of possessing child pornography and was sentenced to imprisonment followed by a period of supervised release. *Id.* at 1085. As a condition of his supervised release, Zinn was required to participate in a sexual offender treatment program, which included a polygraph component. *Id.* at 1086. Zinn challenged that condition, arguing that it violated his Fifth Amendment rights and delegated too much authority to his probation officer. *Id.* at 1088.

The court, applying *Murphy*, held that Zinn's Fifth Amendment claim was premature. *Id.* at

1091. The court explained:

> It is undisputed that at this juncture there has been no potentially incriminating question or invocation of the privilege, much less any government compulsion to testify over a valid claim of privilege. Such an eventuality is within the realm of possibility, but hypothetical possibilities do not present a cognizable Fifth Amendment claim. As the First Circuit recently observed in rejecting a similar challenge, it would be pure speculation to assume such facts now simply because they might conceivably come to exist at some future time. *See* [*United States v.*] *Davis*, 242 F.3d [49] at 52 [(1st Cir. 2001)] ("Should the court revoke Davis's supervised release as a penalty for his legitimate exercise of his Fifth Amendment privilege, he remains free to challenge that action at the time it occurs. That eventuality, however, has not yet occurred (and may never occur)."). If and when Appellant is forced to testify over his valid claim of privilege, he may raise a Fifth Amendment challenge. In the meantime, we can only decide whether requiring polygraph testing as a condition of supervised release generally violates the Fifth Amendment so as to amount to plain error. We hold it does not.

*See also United States v. York*, 357 F.3d 14, 25 (1st Cir. 2004) ("To the extent York raises

specific Fifth Amendment objections to incriminating questions that may be asked or

coercive tactics that may be employed by the Probation Office, his arguments are premature.

York remains free to assert his Fifth Amendment privilege if, after he begins his supervised

release term in 2006, such circumstances actually arise."); *United States v. Taylor*, 338 F.3d

1280, 1284 (11th Cir. 2003) (holding that Taylor's Fifth Amendment claim was "entirely

speculative because no incriminating questions [had] been asked.").

20

We, therefore, reject Russell's claim that the polygraph requirement is "impermissibly vague" because it does not make clear that he is not required to incriminate himself. Under *Murphy* and its progeny, the Fifth Amendment does not require that a probationer be warned that he or she is entitled to assert the Fifth Amendment privilege before the probationer is asked incriminating questions. Russell, of course, is entitled to assert his Fifth Amendment privilege when asked incriminating questions.[13] Because Russell has not asserted the privilege, his Fifth Amendment claim is premature.

## C. Sanctions

Russell's next challenge to the imposition of COMET supervision is that the sanctions for declining to answer questions during polygraph examinations violate the Fifth Amendment. Specifically, Russell asserts that the consequences for failing to answer a question during a polygraph examination -- which include increased reporting requirements and/or the imposition of a curfew -- deprive his liberty, and therefore, constitute a substantial penalty under Fifth Amendment jurisprudence. We disagree.

The United States Supreme Court addressed a related issue in a plurality opinion in *McKune v. Lile*, 536 U.S. 24 (2002). Lile was a convicted sex offender who was required, while incarcerated, to participate in a sexual abuse treatment program. Through the program,

---

[13] Under *Murphy*, Russell could be compelled to answer incriminating questions, even over threat of the revocation of his probation, as long as his incriminating responses are not used in a subsequent criminal prosecution. 465 U.S. at 435 n.7. This issue, however, does not present itself in the present case.

21

Lile was required to disclose his full sexual history, describing in detail all sexual activities, "regardless of whether such activities constitute[d] uncharged criminal offenses." *Id.* at 30. A polygraph examination was used "to verify the accuracy and completeness of the offender's sexual history." *Id.* If Lile refused to participate in the treatment program, his "privilege status" would be reduced. *Id.* This reduction in "privilege status" would result in the curtailment of Lile's "visitation rights, earnings, work opportunities, ability to send money to family, canteen expenditures, access to a personal television, and other privileges. In addition, [Lile] would be transferred to a maximum-security unit, where his movement would be more limited, he would be moved from a two-person to a four-person cell, and he would be in a potentially more dangerous environment." *Id.* at 30-31. Lile refused to participate in the program, asserting that "that the required disclosures of his criminal history would violate his Fifth Amendment privilege against self-incrimination." *Id.* at 31.

The four-justice plurality of the Supreme Court emphasized that sex offenders re-offend at a significantly higher rate compared to other offenders, and noted that victims of sexual assault are most often juveniles. *Id.* at 32-33. The plurality further recognized that despite the high re-offense rate for sex offenders, "[t]herapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism." *Id.* at 33. The plurality concluded that the treatment program "does not compel prisoners to incriminate themselves in violation of the

22

Constitution" because the consequences of a participant's choice to remain silent did not constitute compulsion. *Id.* at 36.

In reaching this conclusion, the plurality evaluated the consequences for failing to participate in the treatment program, emphasizing that "[a] broad range of choices that might infringe constitutional rights in a free society fall within the expected conditions of confinement of those who have suffered a lawful conviction." *Id.* at 37. In this context, the plurality concluded that a mandatory treatment program "does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life." *Id.* at 37-38. The Court observed that "[i]t is well settled that the government need not make the exercise of the Fifth Amendment privilege cost free." *Id.* at 41.

Justice O'Connor concurred in the judgment, agreeing that Lile's Fifth Amendment right had not been violated. She disagreed with the "atypical and significant hardship" test imposed by the plurality based upon Lile's status as an inmate, but determined that the consequences facing Lile were not "serious enough to compel him to be a witness against himself." *Id.* at 50 (O'Connor, J., concurring in the judgment). In her concurring opinion, Justice O'Connor provided an overview of the Supreme Court's jurisprudence with respect to when a penalty imposed on the assertion of the Fifth Amendment privilege is impermissible, explaining that "[t]he text of the Fifth Amendment does not prohibit all

23

penalties levied in response to a person's refusal to incriminate himself or herself -- it prohibits only the compulsion of such testimony. Not all pressure necessarily 'compel[s]' incriminating statements." 536 U.S. at 49. Justice O'Connor continued by describing the "penalty cases":

> Our precedents establish that certain types of penalties are capable of coercing incriminating testimony: termination of employment, *Uniformed Sanitation Men Ass'n, Inc. v. Commissioner of Sanitation of City of New York*, 392 U.S. 280, 88 S. Ct. 1917, 20 L. Ed.2d 1089 (1968), the loss of a professional license, *Spevack v. Klein*, 385 U.S. 511, 87 S. Ct. 625, 17 L. Ed.2d 574 (1967), ineligibility to receive government contracts, *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L. Ed.2d 274 (1973), and the loss of the right to participate in political associations and to hold public office, *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S. Ct. 2132, 53 L. Ed.2d 1 (1977).

*Id.* at 49-50. As the plurality opinion noted, however, the traditional penalty cases addressed above "involved free citizens given the choice between invoking the Fifth Amendment privilege and sustaining their economic livelihood." *Id.* at 40.

In present case, Russell occupies a middle ground between a free citizen (as in the traditional penalty cases) and an inmate, as in *McKune*. He is, however, a person who has been convicted of a crime and sentenced to a period of incarceration, which was suspended upon the condition that comply with the terms of probation. Indeed, "[p]robation is a matter of grace which is in effect a bargain made by the people with the malefactor that he may be free as long as he conducts himself in a manner consonant with established communal standards and the safety of society." *Smith v. State*, 306 Md. 1, 6 (1986).

24

Although we recognize that *McKune*, *supra*, addressed the issue of penalties for failure to participate in a sex offender treatment program specifically in a prison environment, we believe that the analyses set forth in that opinion -- by both the plurality and concurring opinions -- are helpful in resolving this case. Agent DeGross explained that the penalties that would be imposed upon Russell if he declines to participate in a polygraph examination are increased reporting requirements and/or the imposition of a curfew. The penalties are clearly less severe than those at issue in *McKune*, *supra*, which included reduction in a prisoner's visitation rights, earnings, and work opportunities, as well as transfer to a maximum-security unit, among other sanctions. Indeed, "probationers do not enjoy the absolute liberty to which every citizen is entitled. Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *United States v. Knights*, 534 U.S. 112, 119 (2001) (internal quotation and citation omitted).

Applying the test set forth by the plurality in *McKune*, we conclude that the increased reporting and curfew potentially imposed in this case "do not constitute atypical and significant hardships in relation to the ordinary incidents of" probation. *McKune*, *supra*, 536 U.S. at 31-32. Furthermore, applying the standard utilized by Justice O'Connor in her concurrence, we believe that the increased reporting requirements and curfew imposed as sanctions are not "serious enough to compel [Russell] to be a witness against himself." *Id.*

25

at 50.   Accordingly, we reject Russell's claim that the COMET program's sanctions for declining to answer questions during a polygraph examination violate the Fifth Amendment.

**D.    Legislative Scheme**

Russell's fourth contention with respect to the polygraph component of COMET supervision is that the polygraph component is an impermissible condition of probation because it "assumes or encroaches on [another] entity's role."  In support of this assertion, he cites cases in which the trial court imposed, as a condition of probation, sanctions such as prohibiting operation of a motor vehicle even if the MVA restored a probationer's licence, *see Sheppard v. State*, 344 Md. 143 (1996), a condition that a probationer not work in a pharmacy without the court's permission even if his pharmacy license were restored, *see Towers v. State*, 92 Md. App. 183 (1992), and a condition that prohibited a probationer from seeking custody of her children until she first received permission from the judge, *see Smith v. State*, 80 Md. App. 371 (1989).

Russell observes that, in 2006, the General Assembly authorized polygraphs of certain sex offenders subject to extended sexual offender parole supervision. 2006 Md. Laws, Spec. Sess., ch. 4.  The General Assembly passed additional legislation in 2010, modifying the 2006 legislation to require or allow a sentencing court to impose a term of lifetime sexual offender supervision on certain persons.  2010 Md. Laws, chs. 176, 177, CP §§ 11-723, 11-724.  The 2010 legislation authorized a court to impose polygraph examinations as a condition of lifetime sexual offender supervision.  CP § 11-723(d)(3)(vii).  Russell asserts

26

that because the General Assembly authorized polygraphs "only under certain very limited circumstances," the court lacked the authority to impose a polygraph requirement as a condition of probation. We are unpersuaded.

Neither the 2006 nor the 2010 legislation regulate, in any way, the court's authority to impose reasonable conditions on the terms of the probations established by the court. The 2006 legislation involved supervision during parole. The 2010 legislation involved lifetime sexual offender supervision, which commences "on the expiration of the later of any term of imprisonment, probation, parole, or mandatory supervision." CP § 11-723(c)(1)(ii). The fact that the General Assembly passed legislation permitting polygraph requirements for individuals *not on probation* does not suggest that the court lacks authority to impose polygraph requirements for individuals *currently on probation*.

Simply put, nothing about the 2006 and 2010 legislation relied upon by Russell affects the trial court's authority to impose conditions of probation in any manner. Section 11-723(d)(3) of the Criminal Procedure Article lists various other conditions that a court may impose as a condition of lifetime sexual offender supervision, including, *inter alia*, GPS monitoring; restricting an individual from living in proximity or loitering near schools, child care centers, or other places used primarily by minors; restricting an individual from obtaining employment or participating in an activity that would bring the person into contact with minors; a prohibition on the use of illicit drugs and/or alcohol; and prohibiting a person from contacting specific individuals or categories of individuals. Many of these same

27

conditions are commonly imposed as conditions of probation for sex offenders.[14]  We find

illogical any reading of this statute that would allow these conditions to be imposed during

lifetime sexual offender supervision, but disallow these conditions to be imposed during the

limited duration of one's probation.  Indeed, Russell cites no additional authority to suggest

that courts lack the authority to impose polygraph testing as a condition of probation.

Accordingly, we reject Russell's assertion that the trial court exceeded its authority by

imposing the polygraph component of COMET supervision.

### III.  GPS Monitoring

Russell's final contention is that the circuit court abused its discretion by imposing the

GPS monitoring component of COMET supervision.  His argument is the same as we address

in *supra*, Section II(D), i.e., that the 2006 and 2010 legislation providing for lifetime

monitoring of certain sex offenders restricts a court's authority to order GPS monitoring to

circumstances not applicable in the present case.  As discussed *supra*,  nothing about the

2006 and 2010 legislation relied upon by Russell affects the trial court's authority to impose

conditions of probation in any manner.  *See supra*, pp. 25-27.  Accordingly, we reject

---

[14] The condition requiring a probationer to abstain from using illicit drugs is a routine condition of probation for any crime.

Russell's assertion that the trial court exceeded its authority by imposing the GPS component

of COMET supervision.

> **JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**