874 A.2d 423

**In re BILLY W., Jessica W., Mary S. & George B.**

**No. 92, Sept. Term, 2004.**

Court of Appeals of Maryland.

May 11, 2005.

**676**

Geraldine K. Sweeney, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioners.

C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Francine Krumholz (Emily Rody, Legal Aid Bureau, Inc., on brief), for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

In this action between the biological parent, Tammy B., and the State we have been asked to consider whether the trial court properly admitted hearsay testimony, within the context of a permanency planning hearing in which the court maintained extant permanency plans for children who previously

had been declared in need of assistance. We decline to reach the admissibility issue, however, because the trial court's orders, from which the appeal was taken, continuing the permanency plans for the children, do not constitute final judgments nor appealable interlocutory orders.

## I. Facts and Procedural History

Tammy B. has four children: Mary S., born in 1991, Jessica W., born in 1992, Billy W., born in 1994, and George B., born in 2000. The father of Mary S., Jessica W., and Billy W. is deceased and the father of George B. is Michael B., Tammy B.'s husband, from whom she is now separated. All four children resided with both Tammy B. and Michael B. prior to the parents' separation. The family first came to the attention of the Baltimore County Department of Social Services ("DSS") when Mary S., then eight years old, alleged that she had been sexually abused by Michael B., who was later charged and convicted. DSS, during its investigation of the sexual abuse allegations, determined that Tammy B. was aware of Michael B.'s past history of sexual abuse and knew of Michael B.'s behavior with Mary S., but had failed to take appropriate action to protect the girl. All of the children, nevertheless, remained in Tammy B.'s care after she and Michael B. separated. During the next two years there were four additional investigations by DSS of abuse and neglect, including allegations that Mary S. had sexually abused Billy W.

On February 7, 2002, DSS removed all four children from Tammy B.'s care, placed them under emergency shelter care, and subsequently filed a petition in the Circuit Court for Baltimore County requesting judicial approval of shelter care for the children. The court conducted a hearing and ordered DSS custody of the children, and shelter care for them, pending an adjudicatory hearing.[1] Thereafter, during the adju-

---

1. An adjudicatory hearing is "a hearing under this subtitle [Juvenile Causes] to determine whether the allegations in the petition, other than the allegation that the child requires the court's intervention, are true."

dicatory hearing, all four children were declared to be children in need of assistance ("CINA")[2] and committed to the care and custody of DSS for placement in foster care. The court also established a permanency plan[3] of reunification with

---

Md.Code (1973, 2002 Repl.Vol.), § 3–801(c) of the Courts and Judicial Proceedings Article.

2. Md.Code (1973, 2002 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article defines a CINA as:

"Child in need of assistance" means a child who requires court intervention because:
(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

3. Md.Code (1984, 1999 Repl.Vol.), § 5–525(e) of the Family Law Article states:

*Development of a permanency plan.*—(1)  In developing a permanency plan for a child in an out-of-home placement, the local department of social services shall give primary consideration to the best interests of the child.  The local department shall consider the following factors in determining the permanency plan that is in the best interests of the child:
(i) the child's ability to be safe and healthy in the home of the child's parent;
(ii) the child's attachment and emotional ties to the child's natural parents and siblings;
(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;
(iv) the length of time the child has resided with the current caregiver;
(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement;  and
(vi) the potential harm to the child by remaining in State custody for an excessive period of time.
In addition, Maryland Code (1973, 2002 Repl.Vol.), Section 3–823(e) of the Courts and Judicial Proceedings Article states:
*Determinations to be made at hearing.*—At a permanency planning hearing, the court shall:
(1) Determine the child's permanency plan, which may be:
(i) Reunification with the parent or guardian;
(ii) Placement with a relative for:
1. Adoption;  or
2. Custody and guardianship;
(iii) Adoption by a nonrelative;
(iv) Guardianship by a nonrelative;

Tammy B. if she satisfied various conditions set forth in the court's order as follows:

> ORDERED ... Visitation for mother shall be two hours one time a week at DSS agency with the girls (Jessica and Mary Alice) unless otherwise indicated differently by Mary Alice's therapist. Visitation for father shall be one hour one time per week supervised with the boys (Billy and George) at the DSS agency. If father does not exercise his visitation then mother may pick another location for her visitation as agreed .... it is further

> ORDERED that ... reasonable efforts continue to be made to make it possible for the children to return home. Conditions—Mother is to cooperate with DSS in providing background information, signing release forms for any educational, medical or any other information needed to provide services for children and family.... Mother is to continue and finish parenting skills classes and sign release of information regarding parenting class. Mother is to submit to a psychiatric and psychological evaluation by a qualified doctor in respect to her parenting abilities and techniques, she is to follow any recommendations for treatment as a result of the evaluation.

Initially, DSS placed Billy W. and George B. together in a foster home; however, both boys were removed due to allegations that Billy W. had sexually abused a younger child in the home. After a brief stay in another home, Billy W. was committed to St. Vincent's Center, a residential treatment center, from June 2002 until November 2003, when DSS transferred him to a therapeutic foster home. During that

---

(v) Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances;

(vi) Continuation in placement for a specified period because of the child's special needs or circumstances; or

(vii) Independent living; and

(2) For a child who has attained the age of 16, determine the services needed to assist the child to make the transition from placement to independent living.

same time, George B. was moved to another foster home where he has remained.

Mary S. and Jessica W. were placed together in a foster home; after six weeks both were moved to a therapeutic foster home. In August 2002, Mary S. was admitted to Sheppard Pratt Hospital for suicidal behavior, where she was diagnosed with "aggressive disorder recurrent with psychosis" and "possible dissociative disorder." Mary S. stayed at Sheppard Pratt for six weeks, was discharged and moved to transitional housing, and then to the Villa Maria Residential Treatment Center for six months, before returning to the original therapeutic foster home in May 2003. Jessica W. has remained in the original therapeutic foster home the entire time.

The Circuit Court conducted periodic review hearings,[4] and on June 23, 2003, DSS recommended, and the court ordered, a change in the permanency plan for George B. from reunification to a concurrent plan of reunification with Tammy B. and adoption. The court also increased Billy W., Jessica W., and Mary S.'s visitation with Tammy B. to include one additional hour of unsupervised visitation and maintained the same plans of reunification with Tammy B. for the three children. Tammy B. did not object to the maintenance of the permanency plans for Billy W., Jessica W. or Mary S., but contested the

---

**4.** Md.Code (1973, 2002 Repl.Vol.), § 3–823(h) of the Courts and Judicial Proceedings Article states:

*Periodic reviews.*—(1)(i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded.

(ii) The court shall conduct a review hearing every 12 months after the court determines that the child shall be continued in out-of-home placement with a specific caregiver who agrees to care for the child on a permanent basis.

(iii) 1. Unless the court finds good cause, a case shall be terminated after the court grants custody and guardianship of the child to a relative or other individual.

2. If the Court finds good cause not to terminate a case, the court shall conduct a review hearing every 12 months until the case is terminated.

change in the permanency plan for George B. and noted an appeal to the Court of Special Appeals, which affirmed the judgment of the Circuit Court in an unreported opinion, see *In re George B.*, 157 Md.App. 712, No. 1029, September Term 2003 (filed June 10, 2004). While that appeal was pending in the Court of Special Appeals, the Circuit Court held another six month review hearing on November 10, 2003, which is the subject of the present appeal before this Court.

During the review hearing, DSS filed a report addressing the status of each child and Tammy B.'s efforts to comply with various service agreements, to which Tammy B. objected on hearsay grounds, which was overruled by the court. In addition, DSS produced its only witness, the foster care worker, Ms. Kristy Caceres, who testified about the current status of each child and the interactions among Tammy B. and the children. During the November 10, 2003 hearing, Tammy B. testified about her relationships with the children and her ability to care for them. At the conclusion of the hearing, the trial court continued the commitment of all four children to the care and custody of DSS. The judge also continued the permanency plans for Billy W., Jessica W., and Mary S. as reunification with Tammy B., and noted that "if the continued visitations [did not] show improvement and there [were] really serious behavioral ramifications to the[se] [three older] children, the plans ought to be something other than to return home." Accordingly, the court ordered that Tammy B.'s visitation with Billy W. and Jessica W. would remain two hours supervised per week and one hour unsupervised per week. As to Mary S., the parties agreed, and the court acquiesced in the decision, that Tammy B. would be permitted one hour supervised visitation per week with Mary S. and that the unsupervised visitation would be suspended.[5]

---

5. During the November 10, 2003 hearing, Ms. Caceres testified about the visitation between Tammy B. and Mary S.:

As of right now Mary sees her mother during family therapy.... The Court had specified that Mrs. B. was entitled to unsupervised visits with Mary as well as the supervised portion. It was several months, at least as of August, that stopped. Mary indicated to first her foster

With respect to George B., the hearing judge noted that "the problem [was] different":

> With George B. there is a concurrent plan [of reunification with Tammy B. and adoption]. . . . The difference with the way I see George B.'s visits structured is that you have a three-and-a-half-year-old child who has three hours of visits with mother once a week and then sometimes we back that up with an extra hour with his father. I don't know whether his processing difficulties and his behavioral difficulties are because he sees his mother and has visits or because we load so much up at one time that he can't adjust to that and cope with that. . . . [Tammy B.] has had a total of three hours a week [of visitation], and I think that we ought to mix it up, an hour and a half unsupervised and an hour and a half supervised [visitation], and see how that goes.

Essentially, Tammy B. continued to have three hours of visitation with George B., but the supervised visitation was reduced to one and a half hours per week. In addition, the court ordered that the permanency plan for George B. should remain a concurrent plan of reunification with Tammy B. and adoption. Both Tammy B. and Michael B. noted separate appeals to the Court of Special Appeals concerning all of the children with respect to the admissibility of hearsay testimony during the hearing, and from the court's order regarding George B. In an unreported opinion, the intermediate appellate court addressed the substantive issues raised by the parties and affirmed the judgments of the Circuit Court.[6]

---

parent, then to workers, and then to her mother, Mrs. B. that she did not want to have unsupervised visits with her mother, and those—and Mrs. B. agreed and it stopped.

**6.** In the Circuit Court, the cases pertaining to each child were separately docketed; however, the various hearings were always consolidated to include all four children in a single hearing. On appeal to the Court of Special Appeals, Tammy B. and Michael B.'s separate appeals were consolidated, briefed and argued, all of which occurred prior to our recent decision in *In re Samone H. and Marchay E.*, 385 Md. 282, 869 A.2d 370 (2005), establishing the requirements of appellate review for judgments arising from permanency plan review hearings.

Thereafter, Tammy B. filed a petition for writ of certiorari [7] in this Court to consider the following question:

Did the trial judge err in admitting hearsay evidence at the permanency plan review hearing in these CINA cases?

We granted the petition and issued the writ of certiorari, *In re Billy W.*, 383 Md. 569, 861 A.2d 60 (2004). Because we hold that the trial court's orders, from which this appeal is taken, continuing the permanency plans for the children do not constitute final judgments nor appealable interlocutory orders, we do not reach any other issue. *See Montgomery County v. Ward*, 331 Md. 521, 528–29, 629 A.2d 619, 622–23 (1993).

## II. Discussion

As a threshold matter in this case, we are faced, once again, with resolving whether an order continuing a previously established permanency plan is appealable. Tammy B. argues that such orders should be appealable because the trial court's refusal to abrogate DSS's custody of the children and to return them to her is a denial of her parental rights. In Tammy B.'s view, as long as DSS has custody of the children, she is being deprived of her parental rights, and therefore, the orders continuing the permanency plans are appealable.

DSS contends that, based upon our recent decision in *In re Samone H. and Marchay E.*, 385 Md. 282, 869 A.2d 370 (2005), the trial court's orders preserving the existing permanency plans for the children are not immediately appealable because the orders did not adversely affect Tammy B.'s parental rights. We agree and shall explain.

### A. Fundamental Rights of Parents

As we have often stated, a parent's interest in raising a child is a fundamental right, recognized by the

---

7. We granted certiorari and docketed this case as *In re Billy W., Jessica W., Mary S., and George W.*, No. 92, September Term, 2004, and ordered that the case be heard on the same day as a second related case, *In re Billy W., Jessica W., Mary S., and George W.*, No. 100, September Term, 2004, and also *In re Ashley E., Laione D., Matthew B., Gregory B.-G.*, —— Md. ——, —— A.2d ——, No. 90, September Term, 2004.

United States Supreme Court as well as this Court. *See Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000); *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, 652 (1944); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1041, 1045 (1923); *In re Victor A.,* 386 Md. 288, 872 A.2d 662 (2005); *In re Mark M.,* 365 Md. 687, 705, 782 A.2d 332, 342–43 (2001). Such rights are so fundamental that they "cannot be taken away unless clearly justified," *Boswell v. Boswell,* 352 Md. 204, 218, 721 A.2d 662, 669 (1998)(citing *In re Adoption No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994)), because a parent's interest "occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility." *In re Yve S.* 373 Md. 551, 567, 819 A.2d 1030, 1039 (2003), quoting *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 112, 642 A.2d 201 (1994), in turn quoting *Lassiter v. Department of Social Services,* 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *see also, Shurupoff v. Vockroth,* 372 Md. 639, 650, 814 A.2d 543, 550 (2003); *In re Mark M.,* 365 Md. at 705, 782 A.2d at 342–43; *Boswell,* 352 Md. at 218, 721 A.2d at 669.

We have recognized, however, that a parent's right to raise his or her children is not absolute, and there may be counter-vailing considerations that the State, pursuant to its *parens patriae* authority, must protect:

> We have held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell,* 352 Md. at 219, 721 A.2d at 669; *see also In re Adoption No. 10941,* 335 Md. at 113, 642 A.2d at 208 (stating that "the controlling factor . . . is . . . what best serves the interest of the child"). That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. As we

stated in *In re Adoption/Guardianship No. A91–71A*, 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is "a consideration that is of transcendent importance" when the child might otherwise be in jeopardy. *Id.* at 561, 640 A.2d at 1096 (citation omitted).

\* \* \*

We have recognized that in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active. *See In re Justin D.*, [357 Md. 431, 448, 745 A.2d 408, 417 (2000) ].

*In re Mark M.*, at 365 Md. at 705–07, 782 A.2d at 343–44.

## B. The Child Welfare System and Permanency Planning

In Maryland, the General Assembly has enacted a comprehensive statutory scheme to ascertain whether a child is in need of assistance due to his or her parents' inability or unwillingness to care for him or her. Pursuant to the statute, when the local department of social services receives reports of abuse or neglect, it is required to investigate such reports, and in accordance with its findings, render appropriate services in the best interests of the child, including reunifying the child with a parent or petitioning the juvenile court to commit the child to the department's care and custody. *See* Md.Code (1984, 2002 Repl.Vol., 2004 Cum.Supp.), § 5–710 of the Family Law Article. If the juvenile court determines that the child is in need of assistance (CINA), the court may order, among several options, that the child be committed to the local department for out-of-home placement in a foster home or with relatives. *See* Md.Code, (1984, 2002 Repl.Vol., 2004 Cum.Supp.) § 5–525 of the Family Law Article.

One of the important purposes of the child welfare system is to provide a permanent and stable environment for children declared CINA, and to prevent those children from languishing in foster care. Accordingly, in order to facilitate this goal, the Maryland statutory scheme directs the local department of social services to "develop and implement a permanency plan that is in the best interests" of those children committed to

the custody of those departments. *In re Yve S.*, 373 Md. at 574, 819 A.2d at 1044, quoting *In re Adoption/Guardianship No. 10941*, 335 Md. at 103–06, 642 A.2d at 203–05; Md.Code (1984, 1999 Repl.Vol., 2002 Cum.Supp.), § 5–525(e) of the Family Law Article. In *In re Damon M.*, we identified the importance of a permanency plan:

> The permanency plan is an integral part of the statutory scheme designed to expedite the movement of Maryland's children from foster care to a permanent living, and hopefully, family arrangement. It provides the goal toward which the parties and the court are committed to work. It sets the tone for the parties and the court and, indeed, may be outcome determinative. Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan.

362 Md. at 436, 765 A.2d at 627–28. In *In re Yve S.* we explained the need for trial courts to review permanency plans to ensure that children are being cared for in the best possible manner:

> As *In re Damon M.* observes, the purpose of a permanency plan is to set the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation. Once set initially, the goal of the permanency plan is re-visited periodically at hearings to determine progress and whether, due to historical and contemporary circumstances, that goal should be changed. It is not the purpose of the initial permanency plan hearing, however, to resolve all issues involved in that final resolution. If that were the case, there would be no need for review of how, on a regular basis, the plan is progressing or not. Also as *In re Damon M.* indicates, the initial permanency plan hearing is to be held and conducted expeditiously. Protracted proceedings in establishing the initial plan defeat the purpose of the statute. The statute presumes that, unless there are compelling circumstances to the contrary, the plan should be to work toward reunification, as it

is presumed that it is in the best interest of a child to be returned to his or her natural parent.

373 Md. at 582, 819 A.2d at 1049.

In *In re Yve S.*, quoting from *In re Damon M.*, we also delineated the requirements a trial court must follow when implementing a permanency plan:

> [T]he court has the responsibility for determining the permanency plan, § 3–826.1(a)(1) and justifying the placement of children in out of home placements for a specified period or on a long-term or permanent basis, § 3–826.1(d), in addition to conducting periodic, six month reviews. § 3–826.1(f).
>
> *       *       *
>
> Section 3–826.1 [now codified as Section 3–823 of the Courts and Judicial Proceedings Article] requires the court, not later than 11 months after a child found to be in need of assistance has been placed in foster care, *see also* Md.Code (1989, 1991 Repl.Vol., 1997 Cum.Supp.) § 501(m) of the Family Law Article, to hold a permanency planning hearing to determine the permanency plan for that child. § 3–826.1(a)(1) [now § 3–823(b)(1) ]. At that hearing, for each child in placement and in determining the plan, the court is required to make certain decisions and findings, § 3–826.1(c), [now § 3–823(e) ] specifically, whether the child should be: returned to the parent or guardian, § 3–826.1(c)(1)(i) [now § 3–823(e)(1)(i) ]; placed with relatives to whom adoption or guardianship is granted, § 3–826.1(c)(1)(ii) [now § 3–823(e)(1)(ii) ]; placed for adoption, § 3–826.1(c)(1)(iii) [now § 3–823(e)(1)(iii) ]; emancipated, § 3–826.1(c)(1)(iv) [now deleted]; or because of the child's special needs or circumstances, continued in placement on a permanent or long-term basis or for a specified period. § 3–826.1(c)(1)(v) and (vi) [now § 3–823(e)(1)(v) and (vi) ].

*Id.* at 577–81, 819 A.2d at 1046–48 (additions in original). We explained:

> Section 3–826.1(f) [now § 3–823(h) ] mandates periodic reviews of the permanency plan by the court. Subsection

(f)(1)(i) provides [now § 3–823(h)(1)(i) ] that such reviews will be "no less frequently than every six months until commitment is rescinded." If, however, at the permanency planning hearing or a subsequent review hearing, the court, inter alia, orders a child continued in permanent foster care, the court is no longer required to hold the review hearings at six month intervals. Subsection (f)(1)(ii) [now § 3–823(h)(1)(ii), is revised to require review hearings every 12 months.]. As is true of the initial permanency planning hearing, the court must make some determinations at the hearing to review the permanency plan. § 3–826.1(f)(2) [now § 3–823(h)(2) ]. Among other things, in addition to determining whether the commitment remains necessary and appropriate, subsection (f)(2)(i) [now § 3–823(h)(2)(i) ], and evaluating the progress made toward alleviating or mitigating the causes of the commitment, subsection (f)(2)(iii) [now § 3–823(h)(2)(iii) ], the court is required to "determine the extent of compliance with the permanency plan," Subsection (f)(2)(ii) [now § 3–823(h)(2)(ii) ], and to change it "if a change in the permanency plan would be in the child's best interest." Subsection (f)(2)(v) [now § 3–823(h)(2)(vi) ].

*Id.* at 581, 819 A.2d at 1048 (additions in original).

## C.  Appealability of Permanency Plan Orders

■■■■ Appeals may only be taken from a final judgment of the trial court pursuant to Maryland Code (1974, 2002 Repl. Vol.), Section 12–301 of the Courts and Judicial Proceedings Article, which states that, "a party may appeal from a final judgment entered in a civil . . . case . . . [whether] entered . . . in the exercise of original, special, limited, or statutory jurisdiction, unless . . . expressly denied by law." *Smith v. Taylor,* 285 Md. 143, 146, 400 A.2d 1130, 1132 (1979) (internal citations omitted). For the trial court's ruling to be a final judgment it must either determine and conclude the rights of the parties involved or deny a party the means to "prosecut[e] or defend[ ] his or her rights and interests in the subject matter of the proceeding." *Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767, 773 (1989). In considering whether a particular

court order or ruling constitutes an appealable judgment, we assess whether any further order is to be issued or whether any further action is to be taken in the case. *See Rohrbeck,* 318 Md. at 41–42, 566 A.2d at 774.

■ There are instances when a trial court's order constitutes a final appealable judgment even though the order fails to settle the underlying dispute between the parties. *See Ferrell v. Benson,* 352 Md. 2, 6, 720 A.2d 583, 585–86 (1998) (holding that order transferring case to district court was a final and appealable judgment), and cases cited therein; *Moore v. Pomory,* 329 Md. 428, 432, 620 A.2d 323, 325 (1993) (determining that trial court's order dismissing complaint without prejudice was a final judgment); *Horsey v. Horsey,* 329 Md. 392, 401, 620 A.2d 305, 310 (1993) (concluding that trial court's order dismissing former husband's contempt petition against former wife and directing arbitration of alimony dispute was a final appealable order because it had the effect of putting the parties out of court). Clearly, in this case, however, court orders arising from a periodic review hearing that maintain the permanency plans for the children do not constitute final judgments. *See In re Samone H.,* 385 Md. at 302–03, 869 A.2d at 382; *In re Damon M.,* 362 Md. 429, 434, 765 A.2d 624, 627 (2001). An order that is not a final judgment may qualify as an interlocutory order, but ordinarily is not appealable unless it falls within one of the statutory exceptions set forth in Maryland Code (1974, 2002 Repl.Vol.), Section 12–303 of the Court and Judicial Proceedings Article.[8]

---

**8.** Md.Code, § 12–303 of the Court and Judicial Proceedings Article provides:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:
(1) An order entered with regard to the possession of property with which the action is concerned or with reference to the receipt or charging of the income, interest, or dividends therefrom, or the refusal to modify, dissolve, or discharge such an order;
(2) An order granting or denying a motion to quash a writ of attachment; and

*See In re Samone H.*, 385 Md. at 316, 869 A.2d at 390; *In re Damon M.*, 362 Md. at 434, 765 A.2d at 626–27. In *In re Samone H.*, we scrutinized whether an appeal would lie from an order entered after a permanency plan review hearing where the order continuing the permanency plan did not adversely affect the parental rights or change the terms of the permanency plan to the parent's detriment. In that case, the Circuit Court for Baltimore City previously had implemented permanency plans of adoption for two children, Samone H. and Marchay E., both of whom had been adjudicated children in need of assistance, based upon allegations of neglect by their mother, Katina M. *Id.* at 313, 869 A.2d at 388. After

---

(3) An order: (i) Granting or dissolving an injunction, but if the appeal is from an order granting an injunction, only if the appellant has first filed his answer in the cause;

(ii) Refusing to dissolve an injunction, but only if the appellant has first filed his answer in the cause;

(iii) Refusing to grant an injunction; and the right of appeal is not prejudiced by the filing of an answer to the bill of complaint or petition for an injunction on behalf of any opposing party, nor by the taking of depositions in reference to the allegations of the bill of complaint to be read on the hearing of the application for an injunction;

(iv) Appointing a receiver but only if the appellant has first filed his answer in the cause;

(v) For the sale, conveyance, or delivery of real or personal property or the payment of money, or the refusal to rescind or discharge such an order, unless the delivery or payment is directed to be made to a receiver appointed by the court;

(vi) Determining a question of right between the parties and directing an account to be stated on the principle of such determination;

(vii) Requiring bond from a person to whom the distribution or delivery of property is directed, or withholding distribution or delivery and ordering the retention or accumulation of property by the fiduciary or its transfer to a trustee or receiver, or deferring the passage of the court's decree in an action under Title 10, Chapter 600 of the Maryland Rules;

(viii) Deciding any question in an insolvency proceeding brought under Title 15, Subtitle 1 of the Commercial Law Article;

(ix) Granting a petition to stay arbitration pursuant to § 3–208 of this article;

(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order; and

(xi) Denying immunity asserted under § 5–525 or § 5–526 of this article.

several periodic review hearings, Katina M. filed a request for a "bonding study" to have the children evaluated by a psychiatrist to provide an assessment of her relationship with her children. She also had the children subpoenaed to testify at another pending review hearing. During that hearing, the trial judge denied both requests and maintained the extant permanency plans for adoption, from which Katina M. appealed. On appeal, the Court of Special Appeals affirmed the judgment of the trial court, and this Court after granting certiorari, dismissed the appeal, holding that "the trial court's order denying the motion for [bonding] study [was] not an appealable final judgment and [did] not constitute an interlocutory order under Section 12–303(x)." *Id.* at 316, 869 A.2d at 390.[9]

■ In reaching that conclusion, we explained that, "[b]ecause the order continuing the permanency plan did not adversely affect Katina M.'s parental rights or change the terms of the permanency plan to Katina M.'s detriment, the trial judge's actions [were] not reviewable by this Court." *Id.* at 317, 869 A.2d at 391. We further noted that the court's order was not appealable under the collateral order doctrine because the order did not conclusively determine whether the permanency plans should have been changed, was not separate from the merits of the action, and would be reviewable on appeal if the denial had affected the mother's parental rights. Id. at 315 n. 13, 869 A.2d at 390 n. 13. Thus, to be appealable, court orders arising from the permanency plan review hearing must operate to either deprive Tammy B. of the care and custody of her children or change the terms of her care and

---

9. Maryland Code (1974, 1998 Repl.Vol.) Section 12–303(x) of the Court and Judicial Proceedings Article provides:

A party may appeal from any of the following interlocutory orders entered by a circuit court in a civil case:

\* \* \*

(3) An order:

\* \* \*

(x) Depriving a parent, grandparent, or natural guardian of the care and custody of his child, or changing the terms of such an order. . . .

custody of the children to her detriment. *Id.* at 380, 869 A.2d at 299; *In re Damon M.*, 362 Md. at 438, 765 A.2d at 628.

Analogous to the circumstances in *In re Samone H.*, the orders continuing the permanency plans for all four children in the case *sub judice*, are not appealable because the orders did not detrimentally affect Tammy B.'s custody rights or visitation with the children, even though Tammy B. had sought full custody. As in *In re Samone H.*, we conclude once again, that in the absence of a detrimental change in Tammy B.'s care and custody of the children, her parental rights have not been adversely affected to permit an appeal of the lower court's orders maintaining the extant permanency plans. *In re Samone H.*, 385 Md at 315–16, 869 A.2d at 390; *In re Damon M.*, 362 Md. at 438, 765 A.2d at 628. Likewise, the orders are not appealable as collateral orders because the orders are subject to review and change; do not conclusively determine the custody of the children; and do not adversely affect Tammy B.'s custodial rights. *See In re Samone H.*, 385 Md. at 315 n. 13, 869 A.2d at 390 n. 13.

During oral argument before this Court, Tammy B. asserted that our decision in *Frase v. Barnhart*, 379 Md. 100, 840 A.2d 114 (2003), should control decisions affecting the appealability of court orders arising from permanency plan review hearings. The circumstances of *Frase* involved a custody dispute between a mother and her child's caretakers, who, during part of the mother's incarceration, volunteered to care for the child and then sought custody. *Id.* at 102, 840 A.2d at 115. The trial court resolved the dispute by granting custody to the mother, but imposing various conditions upon the terms of her custody including: that she vacate her existing housing, that she apply to and obtain new housing at a specific place where the mother did not want to live, and that the child spend every other weekend with the caregivers. *Id.* at 120, 840 A.2d at 125. The trial court left open the prospect of changing the mother's custody if the mother did not meet the conditions. This Court determined that the custodial order was appealable under Section 12–303(x) because the court's

order operated as a "substantial, albeit partial, deprivation" of her custody. *Id.* at 119–20, 840 A.2d at 125. Similarly, to be appealable in CINA cases involving the biological parent and the State, a court order must operate to deprive a parent of the care and custody of his or her child, or change the terms of custody to the parent's detriment. The present case, nonetheless, is dissimilar from *Frase* in that Tammy B.'s custodial rights had been abrogated when the children were declared in need of assistance and committed to DSS's custody, but not when the trial court maintained the permanency plans for the children, which did not adversely affect Tammy B.'s parental rights. As a result, we conclude that this case is controlled by our decision *In re Samone H.*, and that the trial court's permanency plan orders emanating from the November 10, 2003, hearing are nonreviewable.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED, AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO DISMISS APPEAL; PETITIONER TO PAY COSTS.*