Circuit Court for Montgomery County
Criminal Cases Nos. 124172 (Carnes)
and 121215 (Brookman)

REPORTED

IN THE COURT OF SPECIAL APPEALS

 OF MARYLAND

Nos. 182 and 183

September Term, 2016
_____

CRYSTAL BROOKMAN

v.

STATE OF MARYLAND

_____

MARVIN RANDY CARNES

v.

STATE OF MARYLAND

_____

Nazarian,
Arthur,
Thieme, Raymond G., Jr.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Nazarian, J.
_____

Filed:  April 27, 2017

These consolidated appeals arise from due process challenges by two participants in the Montgomery County Adult Drug Court program (the "Drug Court"). The first, Crystal Brookman, was charged and sentenced to probation. She violated her probation, and was sentenced for that violation to supervised probation with the special condition that she enter and complete Drug Court. While participating in Drug Court, Ms. Brookman twice tested below the accepted level of creatinine, and the second result was treated as a positive test result pursuant to the Drug Court's Participant Handbook.

The second appellant, Marvin Carnes, pled guilty to one count of theft scheme over $1,000 and one count of identity theft. The circuit court imposed concurrent sentences of incarceration, suspending all but time served, with a three-year period of supervised probation. As a special condition of probation, the circuit court required Mr. Carnes to complete Drug Court. During Drug Court, Mr. Carnes missed a urinalysis, which was treated as a positive test result pursuant to the Adult Drug Court Policies and Procedures Manual (the "Drug Court Manual").

After separate appearances, the Drug Court imposed sanctions that included overnight incarceration on both. Both appeal, and the State contends that the sanctions aren't appealable. We hold that they are, and we vacate the sanctions orders and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. The Montgomery County Adult Drug Court Program

The Drug Court is "a post-conviction program for non-violent addicted offenders." Drug Court participants "are placed on special conditions of probation that appropriately

support the goals of recovery and rehabilitation for program participants," who are "[p]laced under the supervision of the Judge assigned to the Drug Court Program." The Drug Court program, which lasts a minimum of twenty months, is broken up into four numbered phases, each with progressively less stringent conditions. Drug Court participants are required to "participate in mandatory, random, urinalysis . . . [and] are subject to the possibility of an additional random urinalysis screening through a 'call-in' program."

Participants in the Drug Court consent to participate after being referred to the program and entering into a Drug Court Agreement. The Agreement specifies, among other things, that participants "understand that [they] can be asked to report for drug and alcohol testing at any time while [they are] Drug Court participant[s] and that [their] failure to report will result in a sanction by the [Drug] Court," that they "will report for drug and alcohol testing as directed," and "that any attempt to falsify a drug and alcohol test, including dilution, is grounds for termination from Drug Court." Drug Court participants must report for random urinalysis as specified in the Drug Court Manual, and "[a]ny failure to appear for random testing will be treated as a positive test result for drugs."

The Drug Court Manual considers the program's proceedings as non-adversarial because they are driven by "a common commitment to the best interests of the participant toward ending his or her addictive behaviors." The Drug Court Agreement, however, contains an exception: "Drug Court imposes graduated sanctions for lack of compliance with program requirements, including incarceration. [Participants] have the right to request

2

and have a formal adversarial hearing before the imposition of a sanction of incarceration or before being terminated from Drug Court."

Violations of the Agreement are punished with sanctions that escalate with each subsequent violation. The Participant Handbook warns participants that they will be subject to sanctions for failing to report and comply with the Drug Court guidelines and specifies the "graduated sanctions," or "Menu of Sanctions," they face when they fail to comply with the Drug Court's program. These graduated sanctions are "vital to the support and reinforcement of the adopted treatment interventions" and leverage "[t]he rapid imposition of negative sanctions as incentives to improve compliance and to modify negative behaviors." (Emphasis omitted.) Participants must report in person to the next available Drug Court docket after they violate any terms and conditions of enrollment because "sanctions are most effective when applied immediately."

### B.    Ms. Brookman

On August 28, 2012, Ms. Brookman was charged with four counts of theft and conspiracy to commit theft. She pled guilty to one count of theft over $1,000 on September 14, 2012. On October 22, 2012, the circuit court imposed a suspended sentence of incarceration for twelve months, placed her on two years' supervised probation with the special condition that she abstain from alcohol and drug use and submit to random urinalysis, and required her to pay restitution. On December 13, 2013, Ms. Brookman admitted to violating her probation, and the circuit court sentenced her, among other things, to three years' supervised probation with the special condition that she "[e]nter into the

3

Mont. Co. Adult Drug Court, comply with all conditions, and successfully complete and graduate from the Mont. Co. Adult Drug Court."

As part of the Drug Court program, Ms. Brookman submitted to a urine test in July 2014 that yielded a low creatinine[1] result. On February 24, 2016, while in Phase 3 of the Drug Court program, Ms. Brookman was notified that another urinalysis showed low creatinine levels. The next day, Ms. Brookman filed a line demanding the presence of the analyst and technician at a hearing and for discovery related to the test results.

At the hearing held on February 26, 2016, two days after and "as a result of [the] low creatinine test," Ms. Brookman's counsel requested a continuance so that she could seek the input of a chemist "to see if [the report] is reliable" and talk to Ms. Brookman about the lab results:

---

[1] Creatinine is a waste product found in the blood that comes from protein in the diet and the normal breakdown of muscles; the kidneys remove it from the blood and it passes out in urine. MedlinePlus, *Creatinine*, U.S. NAT'L LIBR. OF MED., https://perma.cc/24Z5-EGZT (last updated January 4, 2017). A high creatinine level signifies a possible loss of kidney function. In the context of the Drug Court program a low creatinine level, "[d]efined as any creatinine level below 20," doesn't indicate anything about the presence of drugs, but can signify an effort by the participant to overhydrate and dilute his or her urine (and thus defeat the test). For that reason, a low creatinine test is considered a violation based on the number of times it occurs, regardless of the participant's phase.

After the first low creatinine test, the participant receives a written warning; at the time of each additional test, low creatinine is "[c]onsidered a positive urinalysis; [and the] menu [of sanctions] will be followed based on phase and number of previous positives." The Drug Court Participant Handbook's table of sanctions at Phase 3—Ms. Brookman's phase—specifies the sanctions for the first positive or missed urinalysis as "Jail, 30 [meetings in] 30 [days]–90 [meetings in] 90 [days], 2 weeks frequent [urinalysis], change sober date, phase demotion, [and] weekly court for one month." The Drug Court Manual sanctions for Phase 2 and Phase 3 positive urinalysis tests, absent extenuating circumstances, include overnight incarceration for the first violation.

4

> [W]e believe that is a violation of Ms. Brookman's due process. We will ask the opportunity to continue this matter for me to look further into this and speak to an expert. I have spoke to . . . our forensic expert, who was waiting for me to forward him the results of the Lab Corp in order to get in touch with . . . an expert or general toxicologist to figure out what is going on with these results.
>
> Ms. Brookman tested at 18.9, that is very, very close to the 20 [minimum allowable result]. We want to look into whether or not there could possibly be a margin of error or something else within Ms. Brookman that results in this. I think looking at Ms. Brookman as a whole, how she's doing in Drug Court, how she's working with our business case manager. I don't think there's any belief that she is using. And to sanction her, to delay her graduation is not, we don't believe is the appropriate punishment, the appropriate sanction without further review.

Counsel urged the Drug Court to not sanction Ms. Brookman that day because she wanted an "opportunity to review this information further" and "figure it out." The State, however, requested that a sanction be imposed immediately:

> [T]he results are from LabCorp. I don't think there's any dispute that LabCorp is a certified lab. The results state very clearly that her creatinine was 18.9, which is below the established low level limit of 20. We would ask that the sanction be imposed. This is not a violation of probation. There has not been a petition filed to violate her probation. Therefore, the standard of having the chemist and all that does not apply in this circumstance today. I think that there, the point of the sanctions is to have an immediate response and we would ask that the sanction be imposed today based on the lab results. If they're going to challenge that LabCorp is not reliable hearsay, then they're going to challenge every single urine analysis throughout the county. So, I don't think that that is what they're intending to do in terms of the reliable hearsay argument.

5

After acknowledging its guidelines and policies, the Drug Court imposed immediate sanctions, including overnight incarceration. Ms. Brookman filed a timely appeal and we granted Ms. Brookman's Application for Leave to Appeal, ordering her to "address whether the sanctions imposed by the Montgomery County Drug Court, from which the application for leave to appeal was filed, is an action subject to appellate review in the Court of Special Appeals . . . [, and] then address the merits of the issue on appeal."

**C.     Mr. Carnes**

Mr. Carnes was charged on December 30, 2013 with forty-six counts of theft, identity fraud, credit card fraud, conspiracy to commit theft, and related offenses. He pled guilty to one count of felony theft scheme involving property valued between $1,000 and $10,000, and one count of identity fraud on April 15, 2014. On June 11, 2014, the circuit court sentenced him to ten years' incarceration on the felony theft scheme count and eighteen months' incarceration on the identity fraud count, commencing on October 30, 2013, with the balance suspended in favor of three years' supervised probation with conditions, including the condition that Mr. Carnes "enroll in, comply with all conditions of, successfully complete, and graduate from the Montgomery County Adult Drug Court Program."

Mr. Carnes worked as a truck driver. At 7:30 a.m. on February 17, 2016, when it appears from the record that Mr. Carnes was in Phase Three of the Drug Court program, he called the urinalysis line to check whether he needed to report for a drug test. At the time of his call, the list of people to report for a urinalysis on that day had not yet been

updated. So Mr. Carnes began work at 8 a.m., but at some point that day, his truck broke down, and it took him four hours to travel from Cumberland back to Montgomery County.

Mr. Carnes called the urinalysis line again around 1:30 a.m. on February 18, 2016 and learned that he had missed a urinalysis for the previous day. He reported immediately to a testing facility, and the test was negative. Later that day, at 9 p.m., Mr. Carnes also underwent full blood and urine tests, and those tests were negative for drugs as well.

At the February 26, 2016 hearing "regard[ing] a failure to appear for a urinalysis," Mr. Carnes sought to present evidence that he did not actually miss the urinalysis appointment. When asked whether Mr. Carnes appeared on February 17 to give a urinalysis, his counsel responded that she "d[id]n't know what the State's evidence [wa]s going to be." The Drug Court judge responded that "there's no State's evidence" and "no evidentiary requirement."

Mr. Carnes argued that the sanctions menu was not exclusive and did not cover his late urinalysis, which should not "require the same drastic sanction . . . as a missed urinalysis" because he hadn't skipped the drug test to hide that he was using drugs. Counsel argued further that a strict application of the menu of sanctions without an opportunity for the court to consider Mr. Carnes's circumstances violated his due process rights. Counsel pointed out that other members of the Drug Court team did not agree that Mr. Carnes should be sanctioned. Instead, counsel asked the Drug Court to view the sanctions menu as guidelines. Moreover, she argued that a demotion in the Drug Court program would disrupt Mr. Carnes's efforts to reunite his family (he lost his children in 2012). And finally, Mr.

Carnes asked that his overnight incarceration occur on an evening other than the one of his hearing.

The State asked the Drug Court to treat all participants the same, according to the menu, and not to consider sanctions on a case-by-case basis. In addition, the State suggested that the whole situation could have been avoided if Mr. Carnes had called his case manager, which he did not do.

The Drug Court imposed the sanctions in the menu, disagreed with Mr. Carnes that the menu of sanctions were guidelines, and denied his request to change the menu. The court stressed the need for fairness among all program participants and for the integrity of the program's structure. The court told Mr. Carnes that he had called the urinalysis line too early and should have called back later, and that his efforts to remedy the situation occurred too late. The court did, however, grant Mr. Carnes's request that his incarceration occur on another night.

Mr. Carnes filed a timely appeal, and we granted Mr. Carnes's Application for Leave to Appeal, with the same briefing direction that we gave to Ms. Brookman. We will discuss additional facts below, as necessary.

## II. DISCUSSION

Both appellants present essentially identical arguments on appeal. Each contends that the sanctions imposed by the Drug Court should be subject to appellate review, and that the Drug Court violated their rights to due process by imposing immediate sanctions that included, among other things, incarceration, without allowing them an adversarial

8

hearing.[2]  We hold that Drug Court sanctions are appealable, and we vacate the sanctions orders and remand to the Drug Court for an adversarial hearing that complies with Maryland Rule 16-207(f).[3]

### A. The Sanctions Imposed By The Drug Court Are Subject To Appellate Review In This Court.

Ms. Brookman and Mr. Carnes contend that "sanctions imposed by Drug Court at a formal adversarial hearing are subject to appellate review over the final judgments of a criminal court." (citing *Brown v. State*, 409 Md. 1, 9 (2009)). They distinguish non-adversarial sanctions, which "would ordinarily not constitute a final judgment," from

---

[2] In their briefs, both phrased the Questions Presented as follows:

> 1. Whether the sanctions imposed by the Drug Court on February 26, 2016 is an action subject to appellate review in the Court of Special Appeals, where the Drug Court is required to conduct a formal adversarial hearing pursuant to the Drug Court program protocols and Rule 16-206(e), prior to making a decision to immediately incarcerate the appellant?
>
> 2. Whether the Drug Court violated appellant's due process rights to a formal adversarial hearing prior to making a decision to impose an immediate sanction that included incarceration, where the Drug Court did not act in accordance with the protocols of the Drug Court program, where it failed to provide appellant a meaningful opportunity to be heard about the alleged program violation, and where the Drug Court imposed a period of incarceration by reference to a prefixed schedule of program violations?

(Footnote omitted.)

[3] Maryland Rule 16-206 was effective at the time of Ms. Brookman's and Mr. Carnes's February 26, 2012 hearings, and was repealed by Rule 16-207, which became effective on July 1, 2016. We discuss the due process requirements contained in the current Rule 16-207(e) below.

sanctions imposed after a "formal *adversarial* hearing," which "may constitute a final judgment for appeal purposes." (Emphasis in original.) They contend that "the Drug Court action at a formal adversarial hearing is a final judgment because no further action by the Drug Court is reasonably expected related to the violation of that special condition of probation." The State counters that "the imposition of sanctions pursuant to [their] participation in drug court . . . does not constitute a 'final judgment,'" that they were "not subject to sanctions involving a 'loss of liberty' in addition to the restrictions resulting from [their] probationary status," that the circuit court complied fully with Rule 16-206(e), and there is no statutory right to appeal from Drug Court sanctions.

The State is right, as a general matter, that "appellate jurisdiction is dependent upon statutory grant of power." *Lohss v. State*, 272 Md. 113, 116 (1974), *superseded on other grounds by State v. Rush*, 174 Md. App. 259 (2008); *see also Seward v. State*, 446 Md. 171, 176 (2016) (citing *Pack Shack, Inc. v. Howard Cty.*, 371 Md. 243, 247 (2002)) ("The right to appeal is entirely statutory in Maryland."). Maryland Code (1973, 2013 Repl. Vol.), § 12-308 of the Courts and Judicial Proceedings Article ("CJ"), defines this Court's appellate jurisdiction, and "[e]xcept as provided in § 12-307 of this subtitle,[4] the Court of Special Appeals has exclusive initial appellate jurisdiction over any reviewable judgment, decree, order or other action of a circuit court, and an orphans' court."

So, are these reviewable judgments? Normally, that depends on whether they satisfy the "final judgment rule":

---

[4] That section relates to appellate jurisdiction in the Court of Appeals.

> *Except as provided in § 12-302 of this subtitle*, a party may appeal from a final judgment entered in a civil or criminal case by a circuit court. The right of appeal exists from a final judgment entered by a court in the exercise of original, special, limited, statutory jurisdiction, unless in a particular case the right of appeal is expressly denied by law. In a criminal case, the defendant may appeal even though imposition or execution of sentence has been suspended. In a civil case, a plaintiff who has accepted a remittitur may cross-appeal from the final judgment.

CJ § 12-301 (emphasis added). A "final judgment" is "a judgment, decree, sentence, order, determination, decision, or other action by a court, including an orphans' court, from which an appeal, application for leave to appeal, or petition for certiorari may be taken." CJ § 12-101. The core defining principle is whether the judgment fully resolves the claims or issues before the court:

> "[A] final judgment" is one that "either determine[s] and conclude[s] the rights of the parties involved or den[ies] a party the means to 'prosecut[e] or defend[ ] his or her rights and interests in the subject matter of the proceeding.'" *In re Billy W.*, 386 Md. 675, 688[ ](2005) (quoting *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41[ ](1989)) (some alterations in original). Important is whether "any further order is to be issued or whether any further action is to be taken in the case." *Id.* at 689[].

*Douglas v. State*, 423 Md. 156, 171 (2011) (alterations in original).

Our courts have not had occasion to consider whether decisions of the Drug Courts to impose sanctions qualify as final judgments. Courts in other jurisdictions have tended to distinguish decisions arising from drug court programs from traditional court decisions, even when, as here, the same court issues the decision. *See Dunson v. Commonwealth*, 57 S.W.3d 847, 850 (Ky. Ct. App. 2001) ("While this particular drug treatment program is

11

known as the 'Fayette County Drug Court' and while it is operated through this state's Court of Justice, the 'Drug Court' is not a 'court' in the jurisprudence sense; it is a drug treatment program administered by the court system. Accordingly, [the defendant]'s termination from this particular drug treatment program was not subject to due process protections any more than his participation in a private drug treatment program would have been, or his participation in any other rehabilitation program such as anger management counseling or a job training program."); *State v. Jakubowski*, 822 A.2d 1193, 1194 (Me. 2003) (citation omitted) ("Drug court is not a separate court, but a program within the Superior and District Courts in which heightened judicial attention is given to defendants with substance abuse problems."); *State v. Perkins*, 661 S.E.2d 366, 367–68 (S.C. 2008) (stating that the court had no authority to "evaluate and assess the manner in which the [drug court] administrators execute the rules and regulations of the [drug court]" and thus it refrained from interjecting itself into "wholly internal and specific [matters] to each [Drug Court] Program and to each participant"). But in *DiMeglio v. State*, 201 Md. App. 287, 289, 304 (2011), we recognized that the "DUI/drug courts" impose sanctions for violations of the program rather than deciding a participant's guilt or not on the underlying charges. And although both appellants here were sanctioned, both continued in the program itself, albeit under terms that reflected the violation. Thus, we agree with the State that decisions to impose sanctions for violations of the terms of the Drug Court program are not final judgments in the § 12-301 sense.

Even so, subsection (g) of CJ § 12-302 covers the appealability of probation revocation orders, and that seems a better fit:

> (g) *Probation revocation.* – Section 12-301 of this subtitle does not permit an appeal from an order of a circuit court revoking probation. Review of an order of a circuit court revoking probation shall be sought by application for leave to appeal.

Defendants have a right to appeal a revocation of probation because probation may not be revoked, in whole or in part, on the basis of an improper ground. *See, e.g.*, *Baldwin v. State*, 324 Md. 676, 684 (1991). Again, no Maryland case has applied these provisions or principles to sanctions arising from a drug court.[5] In *DiMeglio*, though, we held that there is "no substantive distinction between a sanction imposed for a violation of probation and a sanction imposed in a DUI/Drug Court." 201 Md. App. at 305. And in reaching this conclusion, we accepted the reasoning of the Supreme Court of North Dakota in *In the Interest of O.F.*, 773 N.W.2d, 206, 208 (N.D. 2009), which "consider[ed] the purposes of the drug court, and [found] that they were similar to those a district court would have over an ordinary probationer." *Id.* So where participation in Drug Court is a term of a defendant's probation and there exists an independent possibility of sanctions that deprive the defendant of liberty or extend his or her participation in the program, the defendant stands in a position akin to someone who has (allegedly) violated probation.

---

[5] No reported Maryland case directly addresses *intermediate* sanctions imposed by these programs. In many cases in other jurisdictions, however, defendants have challenged their *termination* from a drug court program. *See Tornavacca v. State*, 408 S.W.3d 727, 730–31 (Ark. 2012) (holding that the defendant had a due process right to appeal an order terminating him from drug treatment court); *State v. Jakubowski*, 822 A.2d 1193, 1194 (Me. 2003) (dismissing an appeal from orders terminating the defendant's "participation in the Adult Drug Treatment Court program (drug court)"); *Hager v. State*, 990 P.2d 894, 899 (Okla. Crim. App. 1999) (holding that the defendant had a due process right to appeal an order terminating him from drug treatment court); *State v. Perkins*, 661 S.E.2d 366, 368–69 (S.C. 2008) (holding that judicial review of the drug court team to terminate the defendant from the drug court program is not mandated by due process).

13

The ability of the Drug Court to sanction participants with incarceration tightens the analogy and, ultimately, leads us to conclude that these orders should be appealable. In *Russell v. State*, we held that orders modifying conditions of defendants' probation are final, appealable judgments because these orders were intended to resolve finally the State's motions to modify the conditions of defendants' probation, and because there was no indication that the terms of probation would be reconsidered at any future time. 221 Md. App. 518, 526, *cert. granted*, 443 Md. 234, *appeal dismissed*, 443 Md. 734 (2015). The Drug Court sanctions imposed in Ms. Brookman's and Mr. Carnes's cases don't modify their individual conditions of probation—the sanctions are elements of the overall program itself—but the sanctions the Drug Court imposed on them had the effect of extending the time before they complete the program. And that is close enough.

We're bolstered further in this conclusion by the fact that the State's position, were we to adopt it, would leave Drug Court participants without any right to appeal from incarceration imposed for minor violations without an adversarial hearing. Yes, Drug Court participants voluntarily agree to join the Drug Court program. But in the course of agreeing to participate, the appellants did not agree, and should not be deemed to have agreed, to be incarcerated without *any* opportunity to challenge the bases on which the court would send them to jail. What if, for example, Mr. Carnes had appeared in time for his urinalysis, but the lab lost the records and reported him as having missed it? Or reported a positive result instead of a negative one? Or if he wasn't due to be tested that day, but the State claimed erroneously that he was? Under the State's theory, he would have neither the right to a hearing nor the right to appeal the process, let alone the decision, that led to

14

his incarceration. Participants' consent to participate in Drug Court is not a blanket waiver of their due process rights, nor a means to insulate the program altogether from constitutional scrutiny. We hold, therefore, that participants who have been sanctioned in a manner that deprives them of liberty or extends their participation in the program have a right to appeal those sanctions in the same manner, and to the same extent, as violations of probation.

**B.      The Drug Court Violated Ms. Brookman's and Mr. Carnes's Due Process Rights To An Adversarial Hearing Prior To Imposing Immediate Sanctions.**

The Drug Court program falls under "problem-solving court programs" as detailed at all times relevant to this case in Maryland Rule 16-206, and now in Rule 16-207. Although Drug Court participants are entitled to some of the rights enjoyed by criminal defendants, they are not entitled to all of them. Rule 16-206(e) detailed the necessary protocols for imposing immediate sanctions on Drug Court participants:

> **(e) Immediate sanctions; loss of liberty or termination from program**. In accordance with the protocols of the program, the court may, for good cause, impose an immediate sanction on a participant, except that if the participant is considered for the imposition of a sanction involving the loss of liberty or termination from the program, the participant shall be afforded notice, an opportunity to be heard, and the right to be represented by counsel before the court makes its decision.[6]

---

[6] The new Rule takes substantially similar form. *Compare* Md. Rule 16-207(f) ("If permitted by the program and in accordance with the protocols of the program, the court, for good cause, may impose an immediate sanction on a participant, except that if the participant is considered for the imposition of a sanction involving the loss of liberty or termination from the program, the participant shall be afforded notice, an opportunity to be heard, and the right to be represented by an attorney before the court makes its decision.").

15

Under section one of the Fourteenth Amendment of the United States Constitution, criminal defendants are entitled to due process of the law. U.S. CONST. amend. XIV, § 1. Again, Maryland courts have not addressed whether the Due Process Clause requires that offenders in drug treatment programs have an opportunity to be heard prior to termination of their participation in treatment programs. But courts in some other states have. *See, e.g.*, *People v. Peterson*, 502 N.E.2d 450, 453 (Ill. App. Ct. 1986); *Deurloo v. State*, 690 N.E.2d 1210, 1212–13 (Ind. Ct. App. 1998); *State v. Grimme*, 274 N.W.2d 331, 336–37 (Iowa 1979); *State v. Lebbing*, 385 A.2d 938, 941 (N.J. Super. Ct. Law Div. 1978); *People v. Woods*, 748 N.Y.S.2d 222, 227 (Rochester, N.Y. City Ct. 2002); *Hagar v. State*, 990 P.2d 894, 898–99 (Okla. Crim. App. 1999). Generally, and much like the appealability analysis above, these courts have analogized the termination of treatment programs to the revocation of parole or probation, both of which invoke minimum due process requirements. *See generally Gagnon v. Scarpelli*, 411 U.S. 778 (1973) (holding that procedural due process safeguards apply to probation revocation proceedings); *Morrissey v. Brewer*, 408 U.S. 471 (1972) (holding that procedural due process safeguards apply to parole revocation proceedings).

"Often, [Drug Court] sanction[s are] imposed automatically, without any opportunity to challenge by the defend[ant]." Tamar M. Meekins, *"Specialized Justice": The Over-Emergence of Specialty Courts and the Threat of a New Criminal Defense Paradigm*, 40 SUFFOLK U. L. REV. 1, 18 (2006); *see also id.* at 18–19 n.85, 31 (discussing how "Washington, D.C.'s drug court does allow for limited challenge by a stand-in defense counsel," a system which "arose as a result of the drug court judges proceeding with

16

sanctioning defendants for alleged violations without any counsel present," and how "[s]anctions are imposed for violation of conditions according to the guidelines of the treatment court," although "[i]ndividual judges sometimes depart from the guidelines for sanctions"). The Montgomery County Drug Court, however, does not automatically impose sanctions because the Drug Court Agreement signed by all participants explicitly provides that they "have the right to request and have a formal adversarial hearing before the imposition of a sanction of incarceration."

Intermediate sanctions serve an important function in a drug court program. *See* Andrew Fulkerson, *How Much Process is Due in the Drug Court?*, 48 CRIM. LAW BULL. 653, 676 (2012) (stating that "[i]ntermediate sanctions for violation of drug court terms and conditions are an integral part of the drug court program" in Idaho); Peggy Fulton Hora & Theodore Stalcup, *Drug Treatment Courts in the Twenty-first Century: The Evolution of the Revolution in Problem-Solving Courts*, 42 GA. L. REV. 717, 762 (2008) ("Brief periods of incarceration for noncompliance with the terms of the treatment program are an integral part of drug treatment courts."). "[S]tudies show that the best predictor of whether there will be behavior change in response to sanctions is the immediacy of those sanctions." Hora & Stalcup, *supra*, at 774 (citation omitted). These sanctions are seen as "providing help," "restructuring the defendant's lifestyle," "smart punishment," "motivational jail," or a "response." James L. Nolan, *Redefining Criminal Courts: Problem-solving and the Meaning of Justice*, 40 AM. CRIM. L. REV. 1541, 1556–57 (2003) (citation omitted). Moreover, some advocates suggest that the possibility of jail as a sanction has contributed to the success of drug courts. *See* Caitlinrose Fisher, Note, *Treating the Disease or*

17

*Punishing the Criminal?: Effectively Using Drug Court Sanctions to Treat Substance Use Disorder and Decrease Criminal Conduct*, 99 MINN. L. REV. 747, 762 n.88 (2014).

Over half of the violations listed in the menu of sanctions in the Drug Court Participant Handbook include incarceration for a first or subsequent violation, and incarceration is more prevalent for violations made in the later phases of the Drug Court program. Despite the role of jail as a potential sanction in Drug Court, though, the goal of the Drug Court program is to allow participants to "live a productive life without engaging in criminal activities and using drugs or alcohol." The Drug Court attempts to focus the program on drug addiction therapy and treatment; recalcitrant participants are terminated from the Drug Court program and returned to the traditional criminal justice system and its forms of punishment.

The other states that have confronted the extent of process due for intermediate sanctions have reached varying conclusions. Some have held that due process rights are implicated when the participants face termination from the program, while others have analogized intermediate sanctions to violations of probation. *Compare State v. Rogers*, 170 P.3d 881, 886 (Idaho 2007) ("The principles articulated in this opinion apply only when a participant in a diversionary program is facing termination from the program because that is when the participant faces a loss of liberty. Intermediate sanctions imposed in these programs do not implicate the same due process concerns, and continued use of informal hearings and sanctions need not meet the procedural requirements articulated here."), *with State v. Shambley*, 795 N.W.2d 884, 894 (Neb. 2011) (holding that drug court program participants are entitled to the same due process protections as persons facing

termination of parole or probation).  A Drug Court program is a form of conditional liberty requiring the defendant to comply with certain conditions or face a loss of privilege, and revocation of that privilege could not occur without inquiry.  *People v. Anderson*, 833 N.E.2d 390, 395 (Ill. App. 2005).

In *DiMeglio*, we said that where a DUI/DWI Treatment Court participant "signed an agreement pursuant to which he agreed that one consequence of failure to comply with the DUI/DWI Treatment Court requirements could be a 'sanction' that included incarceration[, and w]hen the DUI Court imposed such a sanction for [the participant]'s non-compliance, the court was acting under the agreement."  201 Md. App. at 307.  Similarly to the agreement in DUI Court, the Drug Court Manual specifically outlines a menu of sanctions triggered by specific violations.  But unlike the agreement in DUI Court, however, the Drug Court Agreement Ms. Brookman and Mr. Carnes entered specified "that [the] Drug Court imposes graduated sanctions for lack of compliance with program requirements, including incarceration[, and that participants] have the right to request and have a formal adversarial hearing before the imposition of a sanction of incarceration or before being terminated from Drug Court."  Ms. Brookman and Mr. Carnes were further entitled to notice, a hearing, and counsel pursuant to Rule 16-206(e) because, in the face of these particular violations, they faced a loss of liberty.  So although Drug Court participants have notice of the possible sanctions when they agree to participate in the program, they simultaneously get notice of their ability to partake in an *adversarial* hearing before the imposition of sanctions.  In these cases, both appellants sought an adversarial hearing, and neither got one.

19

## 1. The Drug Court violated Ms. Brookman's due process rights.

Citing the Drug Court Agreement, Participant Handbook, and Manual and Rule 16-206(e), Ms. Brookman argues that her due process rights were violated when the Drug Court "assume[d] the existence of a program violation and impose[d] a sanction by reference to a prefixed schedule of program violations." In particular, she contends that the Drug Court violated her due process rights in three ways: "[f]irst, it assumed the existence of a program violation; second, it would not consider her request for time to prepare; and third, it imposed a sanction by reference to a prefixed schedule of program violations." The State responds that the Drug Court complied with Rule 16-206(e) by affording Ms. Brookman's "counsel the opportunity to appear and be heard." We hold that the Drug Court did not comply with Rule 16-206(e), and therefore, vacate the Drug Court's imposition of Ms. Brookman's sanctions and remand her case to the Drug Court for an adversarial hearing.

It's true that there was a hearing before the Drug Court imposed sanctions, that Ms. Brookman was present, and that she had counsel. But the hearing wasn't adversarial. To the contrary, Ms. Brookman sought an opportunity to dispute the results of her urine tests, and sought a continuance so that she could obtain an expert and analyze the results, and the court refused. The court took the State's allegations not only at face value, but as a *fait accompli*, and denied her any opportunity to review or challenge the results before imposing sanctions: "Well, Ms. Brookman, the, you know, we've set up the guidelines and the policies in Drug Court. Positive tests are treated in a certain distinct fashion, low

20

creatinine results are treated in a certain distinct fashion." But where, as here, Ms. Brookman faced incarceration for the deemed-positive test result, this sort of hearing neither complied with the terms of Ms. Brookman's Drug Court Agreement nor afforded her due process. At the very least, she was entitled to an opportunity to review and analyze the test results and offer testimony in her defense before being incarcerated, and even though Rule 16-207 doesn't define notice and an opportunity to be heard in precisely those terms, she was entitled to those safeguards as a matter of due process before incarceration. We have no idea whether she has a defense, nor do we address the Program's treatment of low creatinine readings as a violation—we hold only that Ms. Brookman was entitled to an adversarial hearing, and that the Drug Court erred in denying her one.

### 2. The Drug Court violated Mr. Carnes's due process rights.

Mr. Carnes argues that the Drug Court violated his due process rights in two ways: "[f]irst, it assumed the existence of a program violation; and second, it imposed a sanction by reference to a prefixed schedule of program violations." The State responds that the Drug Court complied with Rule 16-206(e) by affording Mr. Carnes a hearing at which he was allowed to argue that his failure to appear for a urinalysis should be construed as a late, rather than missed, test. We hold that the Drug Court did not comply with Rule 16-206(e), and therefore, vacate the Drug Court's imposition of Mr. Carnes's sanctions and remand for further proceedings.

The reader need not take our word for the fact that Mr. Carnes's hearing wasn't adversarial—the Drug Court judge said as much himself: "[w]e're here for a imposition of a sanction with regard to a failure to appear for a urinalysis in Drug Court, and there was a

21

request for [a] hearing from the defense. . . . This is just as informal as sanctions get." But although the Drug Court heard Mr. Carnes's arguments about considering his individual circumstances in imposing sanctions, it rejected the proposition that the menu of sanctions be considered guidelines and imposed sanctions from the menu for Mr. Carnes's failure to appear for a urinalysis. The Drug Court also failed to consider the recommendation by the other members of the Drug Court team, who did not think that Mr. Carnes should be sanctioned pursuant to the sanctions menu under the circumstances. Mr. Carnes was due an adversarial hearing, and the Drug Court, by its own reckoning, denied him that opportunity. It may or may not prove availing, but he was entitled to challenge the State's allegations before being incarcerated.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED AND CASES REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. MONTGOMERY COUNTY TO PAY COSTS.**